UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA　　　)
　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　)　　　No. 1:15-cr-91-TRM-SKL
v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　)
JAMES DAVID BRADLEY　　　　　)

## REPORT AND RECOMMENDATION

Defendant filed a motion and supporting brief seeking to suppress all evidence seized as a result of the execution of two search warrants at his premises [Docs. 305 & 306]. Defendant argues his Fourth Amendment rights were violated because (1) the warrant underlying the first search at his residence in McMinn County on September 11, 2014, was not supported by probable cause, and (2) the warrant underlying the second search at his camper in Bradley County on December 29, 2014, was not issued until after the search began. Plaintiff United States of America (the "Government") filed a response opposing the motion arguing (1) there was ample probable cause supporting the first warrant and, in any event, the good faith exception would apply to thwart suppression, and (2) the second warrant was actually issued prior to the initiation of the search [Doc. 329]. Defendant filed a reply [Doc. 339] and the motion is now ripe.[1]

_____

[1] Defendant's motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and the Court's standing order. Defendant filed copies of the returned search warrants with the supporting applications and affidavits, and the attached inventory sheets for the return on the second warrant [Docs. 306-1 & 306-2]. The Government filed the same documents but also included the inventory sheets for the return on the first search [Docs. 329-1 & 329-2]. The documents were not entered as exhibits during a hearing concerning the second search. To avoid further duplication, I will cite only to the more complete set of documents filed in the record by the Government.

For the reasons stated herein, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

## I.    BACKGROUND

On August 25, 2015, an indictment was returned against Defendant and several alleged co-conspirators [Doc. 1]. In multiple counts of the 32-count indictment, Defendant is charged with conspiracy to distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, with distribution of a methamphetamine mixture in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), with possession with intent to distribute a methamphetamine mixture in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), with being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1), and with possession of firearms during and in relation to drug trafficking offenses in violation of 18 U.S.C. § 924 [Doc. 1 at Page ID # 1-14, ¶¶ 1, 12, 14-16, 19-21].

### A.  First Search Warrant

A hearing related to the September 11 search and first warrant is unnecessary; instead, the following information is contained within the four corners of the search warrant application and supporting affidavit ("Affidavit") [Doc. 329-1].[2]

Around 8:15 p.m. on September 11, 2014, State of Tennessee 10th Judicial Drug Task Force ("DTF") Agent Clay Moore ("Agent Moore") presented an application and his Affidavit to a McMinn County judge to obtain a search warrant for the premises occupied by Defendant at 227 County Road 298 in McMinn County, Tennessee [Doc. 329-1]. The Affidavit describes the

---

[2] Defendant did not make any request for, and is not entitled to, a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), as Defendant has not claimed the affiant included false information to obtain the first search warrant.

targets of the investigation, the evidence to be searched for, the premises to be searched, and Agent Moore's 11 years of experience in law enforcement, involvement in more than 100 illegal drug distribution investigations, and knowledge of illegal narcotics and drug traffickers in general [Doc. 329-1 at Page ID # 1789-93, ¶¶ 1 & 2]. The Affidavit also sets forth information supporting probable cause for issuance of the warrant, including that (1) a confidential source (who was identified to the judge) arranged for and conducted a monitored and controlled purchase of methamphetamine with two of Defendant's alleged co-conspirators in the driveway of Defendant's residence at 227 County Road 298 in July of 2014 [Doc. 329-1 at Page ID # 1793-94 & 1795, ¶¶ 3 & 6]; (2) a named cooperating witness provided information on August 12, 2014, that three weeks earlier she had been at Defendant's residence and had observed a "substantial amount of crystal methamphetamine" in the residence along with several identified persons allegedly involved in methamphetamine distribution [Doc. 329-1 at Page ID # 1794, ¶ 4]; and (3) during surveillance of Defendant's residence on the day of the search warrant application, September 11, 2014, officers followed and stopped a vehicle as it left the premises and recovered methamphetamine from the occupants of the vehicle and developed some information from one of the occupants, Shannon Littleton, that supported a conclusion that the seized methamphetamine was obtained while at the premises [Doc. 329-1 at Page ID # 1794-95, ¶ 5].

### B. Second Search Warrant

On December 29, 2014, DTF officers executed a search warrant at 309 Samples Chapel Road, SE, Bradley County, Tennessee, where Defendant was living in a pull-behind, pop-up camper. The affidavit supporting the warrant was signed by Agent Moore ("Second Affidavit").

3

After reciting Agent Moore's experience, training, and familiarity with drug trafficking, the Second Affidavit summarized the guns, currency, and 250 grams of crystal methamphetamine found during the September 11 execution of the first search warrant at Defendant's former residence in McMinn County, Tennessee [Doc. 329-2 at Page ID #1808-12, ¶¶ 1-2];[3] information from a confidential source and "plain view" observations of illegal drug and gun activity made that same day when officers entered the camper in an attempt to find Defendant who was "wanted by the police" [Doc. 329-2 at Page ID #1812-13 & 1814, ¶ 3]; and an encounter with Defendant in the driveway of the camper that evening when Defendant returned to the residence and then attempted to flee from the officers while discarding suspected crystal methamphetamine [Doc. 329-2 at Page ID # 1813-14, ¶ 4].

An evidentiary hearing regarding the Defendant's assertion that the second warrant was not obtained until *after* officers began the December 29 search was conducted on October 6, 2016. At the hearing, the Government offered the testimony of Agent Moore and DTF Sergeant Craig Frost ("Sergeant Frost"). Defendant presented no witnesses. With only minor, insignificant inconsistencies in their testimony, the officers collectively testified as follows.

Sergeant Frost and Agent Moore recounted their extensive law enforcement careers and familiarity with investigations of illegal drug trafficking. As pertinent, on the afternoon of December 29, 2014, sometime between 2:00 and 3:30 p.m., a contingent of some five to seven DTF officers, including Sergeant Frost and Agent Moore, arrived at Defendant's camper to arrest

---

[3] The return inventory from the first search indicates that during the September 11 search, law enforcement officers recovered a large amount of methamphetamine, along with cocaine, marijuana, and assorted pills, guns, documents, measuring scales, police radio scanners, security scanners, cash, and other evidence [Doc. 329-1 at Page ID #1798-1803]. Some of the cash and methamphetamine was found on Defendant's person [Doc. 329-1 at Page ID #1803].

Defendant on two active felony bench warrants issued in connection with the events addressed with respect to the first search. As the DTF officers approached the camper, Sergeant Frost noticed the hasp padlock on the outside of the camper door was unlocked. Given that such a lock would normally be closed upon leaving in Sergeant Frost's experience, the open lock suggested to Sergeant Frost that Defendant was in the camper. DTF officers knocked on the camper door but there was no response. Because the DTF officers thought Defendant was in the camper, two DTF officers entered the small camper to locate and arrest Defendant on the outstanding warrants. Defendant was not in the camper, but the DTF officers who entered the camper saw a gun holster and drug paraphernalia, a methamphetamine pipe, in plain view. The officers decided to set up surveillance to await Defendant's return and to seek a search warrant for a search of the camper. While sitting in his vehicle at the scene, Agent Moore began typing a search warrant using templates on his laptop computer, which is his normal practice.

Several hours passed. Sometime between 7:00 and 7:30 p.m., a white pickup truck approached the camper from the connected driveway located on the opposite side of the property. Sergeant Frost and DTF Director Bill Cherry, Jr. ("Director Cherry") immediately approached the vehicle and asked the exiting man if he was James David Bradley. When Defendant said "yes," they identified themselves as "police." Immediately, Defendant ran in the opposite direction and Sergeant Frost and Director Cherry gave pursuit. As Defendant ran, he was digging in his pockets and Sergeant Frost saw what he thought was currency float in the air. The officers caught up with Defendant as he approached a wooded area where Defendant became tangled in weeds and fell. Sergeant Frost landed on top of Defendant and took Defendant into custody. Sergeant Frost frisked Defendant and found evidence on Defendant's

person. He then took Defendant back to the camper area and began to search the pathway Defendant took in his effort to flee in order to look for evidence discarded by Defendant during his attempted flight.

Sergeant Frost then advised Agent Moore of the evidence he found so that this new information could be added to the Second Affidavit which Agent Moore was in the process of preparing. Around 7:45 to 8:00 p.m., after he completed drafting the Second Affidavit and related paperwork, Agent Moore left the scene to seek a search warrant. Sergeant Frost and other DTF officers remained at the camper with Defendant waiting for approval of the search warrant. Agent Moore estimated the drive to the Bradley County Sheriff's office took around 10 to 15 minutes and that he was there for about 10 to 15 minutes to print the paperwork for presentation to the judge. Agent Moore then drove to the home of Bradly County General Sessions Judge Sheridan C. Randolph to present the warrant application, which took around 10 minutes.

In the meantime, as he waited at the scene Sergeant Frost documented on an inventory sheet the evidence that was discarded in flight by, or found on, Defendant that night.[4] Sergeant Frost noted the time as 8:30 p.m. on this inventory sheet. In anticipation of receiving a search warrant, Sergeant Frost then began to fill in the headings of additional evidence inventory sheets around the time he heard a report from someone that Agent Moore had pulled into the judge's driveway. Sergeant Frost testified it was a common practice to prefill out parts of the inventory sheets while awaiting approval of a search warrant in order to speed up the search process.

---

[4] Sergeant Frost testified he found one item on Defendant's person and two items that had been thrown by Defendant when he fled toward the woods. The inventory sheet of items found "on Persons" indicates that one item was found "on ground" and two items were found on Defendant's person [Doc. 329-2, Page ID # 1815].

Though Agent Moore could not specifically recall this instance, his usual practice with Judge Randolph for warrants issued after normal working hours was to meet in the driveway of the judge's home. Without specific recall, Agent Moore believes Judge Randolph entered his vehicle, swore in Agent Moore who executed the Second Affidavit, and read and signed the warrant without asking any questions. Agent Moore initially testified he made no disclosures other than the information contained in the Second Affidavit to the judge, but later stated he revealed the identity of the confidential source as stated in the Second Affidavit. Agent Moore could not recall how long this process took or exactly when he arrived at Judge Randolph's home, but the search warrant was signed at 8:49 p.m. on December 29, 2014 per Judge Randolph's notation on the executed warrant.

Upon Judge Randolph's execution of the search warrant, Agent Moore called someone with DTF at Defendant's property and reported that the search warrant had been signed. Agent Moore could not recall who he called, but both Agent Moore and Sergeant Frost agreed it was not Sergeant Frost. Sergeant Frost testified the search of the truck and camper did not begin until after someone reported to him that Agent Moore had obtained the judge's signature on the warrant. Sergeant Frost could not recall who relayed this information to him, but the search commenced after the judge executed the warrant and before Agent Moore returned with the physical search warrant. Sergeant Frost filled out parts of the inventory sheets and logged evidence as it was brought to him by other DTF officers.

As it was getting late and it had been a long day, DTF officers at the search scene requested that Agent Moore bring food back when he returned to the scene with the warrant. As a result of stopping to obtain dinner for the on-scene officers, Agent Moore did not arrive back at

the scene until around 9:30 p.m., but he could not recall the specific time he arrived. The search, which took several hours to complete, was in progress when Agent Moore returned to the scene with food.

Upon Agent Moore's arrival back at the scene, both Agent Moore and Sergeant Frost shared the responsibility of completing the inventory sheets. Sergeant Frost and Agent Moore identified their respective handwriting on various portions of the completed inventory sheets.[5] The return inventory sheets indicate evidence was recovered from Defendant's person at 8:30 p.m. [Doc. 329-2 at Page ID # 1815]. The return inventory sheets also state evidence was recovered from Defendant's truck at



[Doc. 329-2 at Page ID # 1816-17], and from Defendant's camper at



[Doc. 329-2 at Page ID # 1818-20]. On two of the three inventory sheets for the search of the camper, Sergeant Frost originally listed the time the search began as 8:30 p.m., but the start time was altered by Agent Moore to reflect the search actually started at 9:00 p.m. as the above example illustrates. The third inventory sheet for the camper, which was prepared solely by

---

[5] The officers' testimony regarding the exact portions of each inventory sheet he completed was not entirely consistent. For example, as to the second page of the inventory of evidence found in the truck [Doc. 306-2, Page ID # 1817], Sergeant Frost initially claimed he completed the date and suspect's name, but then stated he did not write the date on this document. Agent Moore stated he completed this document. Defendant did not argue these minor inconsistencies were material.

8

Agent Moore, lists only 9:00 p.m. as the start time for the search of the camper [Doc. 329-2 at Page ID # 1818-20].

Explaining the time change on the inventory sheets, both officers testified that as Agent Moore was looking over the inventory sheets, he noticed the prefilled time of 8:30 p.m. was wrong and he asked Sergeant Frost what time the search actually started. Upon being told the search started at 9:00 p.m., Agent Moore overwrote and crossed out the 8:30 p.m. prefilled time to correct the time to 9:00 p.m. and initialed the change on the various inventory sheets. Agent Moore admitted he did not have first-hand knowledge of when the search began as he was not there.

Although Defendant cross-examined both Sergeant Frost and Agent Moore, he did not offer any testimony to contradict their version of events.

## II.    ANALYSIS

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. A defendant bears the burden of proof to show that a search performed pursuant to a warrant is unconstitutional. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).

Defendant challenges both searches on Fourth Amendment grounds. Defendant's expectation of privacy and ability to challenge each search is not disputed by the Government. With respect to his challenge to the first search, Defendant's sole argument is that the Affidavit fails to establish probable cause for issuance of the search warrant. With respect to his challenge

to the second search, Defendant's sole argument is that the officers illegally began the search of the camper prior to obtaining the search warrant. Both challenges fail.

### A. The Affidavit Provides Probable Cause for the First Search and, In Any Event, The Good Faith Exception Would Apply

To justify a search, an officer must demonstrate "why evidence of illegal activity will be found in a particular place." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (internal quotation marks omitted). There must be a connection between the location of the search and the subject of the search. "Search warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny." *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006). In deciding whether a warrant application contains sufficient facts to support a reasonable belief in probable cause for a search, a court considers the facts set forth in the supporting affidavit and any facts presented to the issuing judge during the search warrant proceedings. *United States v. Frazier*, 423 F.3d 526, 535-36 (6th Cir. 2005). "Probable cause . . . is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *United States v. Burney*, 778 F.3d 536, 540 (6th Cir. 2015) (alteration in original) (quoting *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014)) (internal quotation marks omitted). "Affidavits for search warrants 'must be tested and interpreted by . . . courts in a commonsense and realistic fashion,' because '[t]hey are normally drafted by nonlawyers in the midst and haste of a criminal investigation.'" *United States v. Colquitt*, 604 F. App'x 424, 430 (6th Cir.), *cert. denied*, 136 S. Ct. 121 (2015) (alteration in original) (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)).

In this case, the Affidavit itself states that the only fact outside of the Affidavit presented to the issuing judge in support of the first search warrant was the identity of the confidential

informant, an assertion not challenged by Defendant. Thus, the Court must make a determination of probable cause based on the information contained solely within the four corners of the Affidavit. *See, e.g.*, *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009) ("In reviewing the sufficiency of the evidence supporting probable cause, [the court is] limited to examining the information contained within the four corners of the affidavit" in light of "the totality of the circumstances."); *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc) ("The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added.").

In making such an evaluation, "great deference" is accorded to the issuing judicial officer's determination of probable cause. *See, e.g.*, *Burney*, 778 F.3d at 540 (quoting *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001)). "[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton,* 466 U.S. 727, 728 (1984).

Defendant argues the Affidavit fails to establish probable cause that Defendant "was involved in the distribution of controlled substances at the location to be searched. The only information provided that could be remotely construed against the Defendant comes from Shannon Littleton, an individual for whom no information is provided regarding her reliability or lack thereof." [Doc. 306 at Page ID # 1530]. Defendant's argument, however, both underrates the totality of the circumstances set forth in the Affidavit and misconstrues the need to establish probable cause to search the property—not Defendant.

11

Defendant's argument that Shannon Littleton was the only person to implicate Defendant as being involved in the investigated activities misses the mark because search warrants are directed at property, not at persons. Thus, warrant specificity requirements apply to the place to be searched and the items to be seized, not to the person against whom the evidence may eventually be used. *See Mays v. City of Dayton*, 134 F.3d 809, 814 (6th Cir. 1998) (holding "[a] determination of probable cause simply requires consideration of whether there were reasonable grounds to believe at the time of the affidavit that the law was being violated on the premises to be searched"). As explained in *Mays*:

> The specificity required by the Fourth Amendment is *not* as to the person against whom the evidence is to be used but rather as to the place to be searched and the thing to be seized. When reviewing an application, courts must bear in mind that search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found.

134 F.3d at 814 (citations omitted) (emphasis in original); *accord United States v. Carter*, 520 F. App'x 377, 381 (6th Cir. 2013). Thus, whether the person identified by Ms. Littleton as "Honky Tonk" was actually Defendant is of little consequence.

More telling, Defendant underestimates the remaining circumstances set forth in the Affidavit. First, law enforcement agents had conducted a controlled purchase of methamphetamine using a confidential source (who was identified to the issuing judge). While the controlled purchase involved two alleged co-conspirators in July of 2014, it took place in the driveway of the premises to be searched. Second, a named cooperating witness provided information on August 12, 2014, that she had been in the residence to be searched and observed a substantial amount of crystal methamphetamine and several persons suspected of

12

methamphetamine distribution. That Defendant was not observed by this named cooperator is of little consequence to the consideration of the probable cause for a search of the residence under the circumstances set forth in the Affidavit. Third, Ms. Littleton's information as to "Honky Tonk" was very recent information indicating that the drug trafficking activities observed in the past at the premises probably continued to transpire.

Defendant appears to focus his argument on Ms. Littleton's information which indicated to Agent Moore that "Honky Tonk" was Defendant. Defendant's argument that Ms. Littleton was not shown to be reliable largely ignores the wealth of information about drug trafficking at the premises provided by the confidential informant (who was identified to the issuing judge), the named cooperating witness, and Ms. Littleton. Information regarding illegal activity that comes to the attention of law enforcement through a confidential informant can serve as the basis for probable cause, so long as the reliability of the confidential informant is established as part of the totality of the circumstances. *United States v. Jones*, 159 F.3d 969, 974 (6th Cir. 1998). In determining the reliability of informant information, the issuing judicial officer—and this Court—"must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances . . . ." *United States v. Helton,* 314 F.3d 812, 819 (6th Cir. 2003) (citations omitted). "[A]n affidavit must state facts supporting an independent judicial determination that the informant is reliable," but the facts need not be stated in "any particular form." *United States v. McCraven,* 401 F.3d 693, 697 (6th Cir. 2005). However, the level of detail of an informant's statement that he or she witnessed criminal activity firsthand, should not be used as the principal indication of reliability because "[b]y relying primarily on the level of detail provided in statements to *assess* their reliability, courts are apt to mistake the best

13

storytellers for the most truthful informants." *United States v. Neal*, 577 F. App'x 434, 443 (6th Cir. 2014), *cert. denied,* 135 S. Ct. 987 (2015). Independent corroboration of the informant's information is not required when the issuing magistrate is provided with assurances that the informant is reliable. *See*, *e.g., Id.* at 440-42; *Helton,* 314 F.3d at 820-21.

The Sixth Circuit has held that statements from an identified individual of unknown reliability to law enforcement are generally sufficient to establish probable cause without further corroboration because the potential legal consequences of lying to the police tend to ensure reliability. *See, e.g., United States v. Miller*, 314 F.3d 265, 270 (6th Cir. 2002) (rejecting argument that a warrant was invalid because it failed to provide any basis as to the reliability or veracity of a named informant and holding that where the informant had been in the residence within the last twenty-four hours, had observed contraband, and was willing to be named in the affidavit as to those facts, "there could hardly be more substantial evidence of the existence of the material sought and its relevance to a crime . . . ."); *United States v. Pelham*, 801 F.2d 875, 878 (6th Cir. 1986) (holding "[w]hen a witness has seen evidence in a specific location in the immediate past, and is willing to be named in the affidavit," probable cause is generally established under the totality of the circumstances). Some post-*Pelham* cases have emphasized the importance of the informant's personal observation of direct, not merely circumstantial, evidence of criminal activity. *See, e.g., United States v. Robbins*, No. 3:05-CR-32, 2006 WL 2323315, at *17 (E.D. Tenn. Aug. 9, 2006) (finding that a warrant lacked probable cause because the informant had not personally observed contraband at the residence).

When viewing the Affidavit under the totality-of-the-circumstances standard and with the required deference, I **FIND** the Affidavit establishes probable cause to support the issuance of

the search warrant for the premises at 227 County Road 298.  The Affidavit recites both historical and current information about drug distribution at the residence.  Some two months prior to the issuance of the first search warrant officers utilized a disclosed confidential informant to make a controlled purchase of methamphetamine from two co-defendants in the driveway of the residence.  About a month prior to the issuance of the warrant, a named cooperator described observing drugs and drug distribution activity at the residence.  On the day the warrant was obtained, officers conducted a traffic stop of a vehicle they followed from the residence and found methamphetamine on two different named individuals in the car and one of the named individuals reported that there had been no drugs in the car prior to its stopover at the residence.  Whatever the value of Ms. Littleton's information in isolation, it was merely part of the overall totality of the circumstances supporting the finding of probable cause.

It is not necessary to further dwell on the issue of probable cause, however, because I also **CONCLUDE** the good faith exception applies in this case.  As the Government contends alternatively, even if the Affidavit were found to be lacking probable cause, the officers executing the search relied in good faith upon the warrant so the evidence should not be excluded.

"The Supreme Court's jurisprudence is clear:  Whether the exclusionary sanction is appropriately imposed in a particular case . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."  *United States v. Buford*, 632 F.3d 264, 275-76 (6th Cir. 2011) (alteration in original, citations and internal quotation marks omitted).  The exclusionary rule applies only "where its remedial objectives are thought most efficaciously served," *Arizona v. Evans*, 514 U.S. 1, 11

15

(1995) (citing *United States v. Leon*, 468 U.S. 897, 908 (1984)), and "where it 'result[s] in appreciable deterrence.'" *Herring v. United States*, 555 U.S. 135, 141 (2009) (alteration in original) (quoting *Leon*, 468 U.S. at 909)).[6] "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs." *Herring*, 555 U.S. at 141 (alteration in original) (quoting *Illinois v. Krull*, 480 U.S. 340, 352-53 (1987)) (internal quotation marks omitted). In the end, the decision to suppress evidence "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Herring*, 555 U.S. at 137.

Because the 'sole purpose' of the exclusionary rule 'is to deter future Fourth Amendment violations," *Davis v. United States*, 564 U.S. 229, 236 (2011), a criminal defendant seeking to suppress the fruits of a search must do more than demonstrate that the police violated the Fourth Amendment. He must show that suppressing the evidence will yield "[r]eal deterrent value." *Id.* at 237. That burden is especially relevant when officers follow the constitutionally preferred route, namely presenting evidence of illegal activity to a neutral magistrate who finds probable cause and issues a search warrant. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). To suppress the fruits of such a search, a defendant must show that, despite the magistrate's authorization, the police could not have relied on the warrant in good faith. *See United States v.*

---

[6] In *Leon*, the Supreme Court held that the exclusionary rule is not intended to, or even able to, cure a violation of a defendant's constitutional rights. As a result, the Court in *Leon* recognized an exception to the exclusionary rule in circumstances where an officer acted in good faith when executing a warrant that he reasonably relied upon to be valid. The Court also enumerated situations in which an officer's reliance on a search warrant could not be presumed reasonable such as when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable and when the warrant is so facially deficient that it cannot reasonably be presumed to be valid. *Leon*, 468 U.S. at 914-23.

*Leon*, 468 U.S. 897, 922-23 (1984). One way to do this is to demonstrate that the information presented in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923. *See also United States v. Justice*, 461 F. App'x 415, 417 (6th Cir. 2012) (reversing the district court because officers who executed the search warrant could have relied in good faith on magistrate's finding of probable cause).

In his reply, Defendant briefly, and without citation to any authority, argues the good faith exception does not apply because Agent Moore "apparently did not believe that probable cause existed to search from the multiple sources of information he had obtained prior to September 11, 2014, as he did not apply or attempt to apply for a warrant prior to the above date." [Doc. 339 at Page ID # 2060]. This argument falls far short of demonstrating the Affidavit was so lacking in indicia of probable cause that official belief in its existence was entirely unreasonable. I **FIND** that the officers' reliance on the search warrant was objectively reasonable, and that application of the exclusionary rule would not provide a deterrent benefit that would outweigh the substantial social costs of exclusion. *See Leon*, 468 U.S. at 922-23; *Herring*, 555 U.S. at 141.

Accordingly, I **CONCLUDE** that suppression of the evidence is not warranted and that the motion to suppress evidence resulting from the execution of the first search warrant should be **DENIED**.

**B. The Second Search**

The entire dispute concerning the second search comes down to whether the search began before or after the warrant was issued. I **FIND** the search began after the warrant was issued by Judge Randolph based on the officers' credible and undisputed testimony. A court is given wide latitude in making its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002). In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic. *See United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005). After considering each officer's demeanor, descriptive account of the events, and overall impression, I **FIND** both Agent Moore and Sergeant Frost gave credible testimony.

The Fourth Amendment expressly imposes two requirements: first, all searches and seizures must be reasonable; and second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity. *See Payton v. New York,* 445 U.S. 573, 584 (1980). The Fourth Amendment does not specify when a search warrant must be obtained, but a warrant must generally be secured and a search and seizure inside a home without a warrant is "presumptively unreasonable." *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006). Indeed, the Government has conceded that if the Court finds that, contrary to the officers' testimony, the search began before Judge Randolph approved the warrant, then the evidence obtained during the second search should be suppressed under the circumstances at hand.

The Supreme Court has held that neither the Fourth Amendment nor Fed. R. Crim. P. 41 imposes a requirement that the executing officers present the property owner with a copy of the search warrant *before* conducting the search. *United States v. Grubbs*, 547 U.S. 90, 99 (2006);

*Groh v. Ramirez*, 540 U.S. 551, 562, n.5 (2004) ("[N]either the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search."). *See also In Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco and Firearms*, 452 F.3d 433, 443 (6th Cir. 2006) (en banc) (in *Bivins* action holding the Fourth Amendment does not compel officers to present a warrant before executing a search); *Frisby v. United States*, 79 F.3d 29, 32 (6th Cir. 1996) ("The Fourth Amendment does not necessarily require that government agents serve a warrant, or an attachment thereto, prior to initiating a search or seizing property."); *United States v. Pritchett*, 40 F. App'x 901, 907 (6th Cir. 2002) (same). Applying this logic, it does not matter that the executed warrant was not on site when the search began.

The warrant return incorporated the inventory sheets, which reflect the time the search warrant was executed. Based solely on the conflicting times listed on the revised inventory sheets, Defendant argues the second search was begun prior to the time Judge Randolph actually issued the December 29 warrant. Defendant argues the officers crossed out the actual time they began the search and wrote in a post-warrant-issuance time in order to disguise that the search was begun before the warrant was issued. If it was a disguise, as argued by Defendant, it was a rather poor cover-up.

It is undisputed the warrant was signed at 8:49 p.m. As noted, the Government concedes suppression would be appropriate if the DTF officers began their search of the camper prior to 8:49 p.m., but argues the evidence is overwhelming that the search did not begin until after the warrant was signed. I agree. Sergeant Frost and Agent Moore both testified consistently and credibly that no one started a search of the truck or camper prior to receiving word from Agent

Moore that the search warrant had been signed by the judge, although neither could recall to whom the call was placed or who relayed the information.

While Defendant's argument suggests there was some hanky-panky or evidence tampering when Agent Moore changed Sergeant Frost's time entries on the inventory sheets, he produced no evidence to support this suggestion. Defendant, who was present for the search, did not present any evidence to contradict the officers' explanation or to refute that the search began at 9:00 p.m. as sworn by the officers. Defendant's theory begs the question: if the officers intended to commit subterfuge, why not hide the deception by completing new pages with no overwriting rather than inviting suspicion by noting the time correction. That is not to say that the officers would not have been better served if they had kept a record of who Agent Moore relayed the search warrant execution information to or who relayed this information to Sergeant Frost. In the absence of even a hint of evidence tampering, however, I find nothing suspicious about the credible testimony of the officers regarding how and why the inventory sheets were corrected to reflect the time the search began. Given the complete lack of evidence of deception, I **FIND** the officers were correcting the time the search began, not obfuscating an illegal search.

There is no requirement that a certain amount of time lapse before a search is begun once a warrant is executed. Instead, a warrant must be executed within 14 days. Fed. R. Crim. P. 41(e)(2)(A)(i). The important determination is that the search did not begin until after Agent Moore called the officers on the scene to report the warrant had been signed. To be sure, "[t]he officer executing the warrant must enter on it the exact date and time it was executed." Fed. R. Crim. P. 41(f)(1)(A). However, while "the procedural steps enumerated in Rule 41[] are important and should not be disregarded, they are ministerial" and thus do not automatically void

an otherwise valid search. *Frisby v. United States*, 79 F.3d 29, 32 (6th Cir. 1996). Violations of Rule 41 generally do not result in suppression unless "(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *United States v. Searp*, 586 F.2d 1117, 1125 (6th Cir. 1978) (quoting *United States v. Burke*, 517 F.2d 377, 386-87 (2d Cir. 1975)). Even if 9:00 p.m. is only an approximation of the time that the search began after Agent Moore's phone call relaying the warrant had been signed, there is no prejudice to the Defendant as the result of the approximation because there is no evidence to suggest the search would not have occurred or would have changed in any way if a more precise time was entered on the warrant return which incorporated the inventory sheets. Likewise, there is no evidence of any intentional and deliberate disregard of Rule 41. The requirement that there be a notation of the time a warrant is executed is purely ministerial, and the lack of a notation or an incorrect notation does not require suppression of any evidence seized pursuant to a valid warrant. *See United States v. McKenzie,* 446 F.2d 949, 954 (6th Cir.1971).

Accordingly, I **CONCLUDE** that suppression of the evidence is not warranted and that the motion to suppress evidence resulting from the execution of the second search warrant should be **DENIED** because I **FIND** the search was conducted after the issuance of the warrant based on the evidence presented.

## III.  CONCLUSION

For the reasons stated above, I **RECOMMEND**[7] that Defendant's motion to suppress

[Doc. 305] be **DENIED**.


s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[7]  Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order.  *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are "frivolous, conclusive or general."  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation marks and citation omitted).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

22